UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 5:26-cv-01282-AB-AJR | Date: | March 19, 2026 |

| Title: | *Diana Garrido v. Kristi Noem et al* |

| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |

| Evelyn Chun | N/A |
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Appearing | None Appearing |

**Proceedings:**   **[In Chambers] ORDER <u>GRANTING</u> PETITIONER'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [Dkt. No. 3]**

Pending before the Court is Petitioner Diana Garrido's ("Petitioner") *Ex Parte* Application for Temporary Restraining Order and Preliminary Injunction ("TRO Application" or "TRO App.," Dkt. No. 3). Petitioner, a noncitizen currently detained in the Adelanto Detention Center, seeks to enjoin Respondents Kristi Noem, Pamela Bondi, Todd Lyons, Andre Quinones, Martin Jimeno, and Fereti Semaia (collectively, "Respondents"), from unlawfully removing her from the United States. For the reasons set forth below, Petitioner's TRO Application is **<u>GRANTED</u>**.

## I.    BACKGROUND

The following facts are drawn from Petitioner's TRO Application. Petitioner Diana Garrido is a thirty-seven-year-old native and citizen of Ecuador who was admitted to the United States on September 29, 1998, on a B-1/B-2 nonimmigrant visa at the age of ten. App. at 2. She has resided continuously in the United States

for nearly twenty-eight years and has never previously been removed. *Id.* Her current removal order is an original, unexecuted order rather than a reinstated order under INA § 241(a)(5). *Id.* In 1999, her parents, through a non-attorney notario lacking legal authority, filed an asylum application in which Petitioner was included only as a derivative child. *Id.* Petitioner had no individual counsel, no individual hearing, and no meaningful opportunity to present her own claims for relief. *Id.* On December 27, 2000, an Immigration Judge granted voluntary departure when Petitioner was approximately twelve years old. *Id.* The Board of Immigration Appeals dismissed her appeal on February 5, 2002. *Id.* A motion to reopen filed on February 19, 2002 was denied, and subsequent filings were likewise dismissed. *Id.* The final Board action occurred on May 5, 2004, when Petitioner was still a minor, approximately fifteen or sixteen years old. *Id.*

Every procedural step in Petitioner's immigration proceedings occurred while she was between the ages of ten and fifteen, and the case has never been reviewed by an Article III court. *Id.* at 3. The removal order has remained dormant and unexecuted for more than twenty-two years. *Id.* During that time, Petitioner established deep ties in the United States and is now the sole caregiver to her United States citizen daughter, born August 21, 2007, who suffers from panic attacks, anxiety, and significant mental health vulnerabilities associated with her father's conduct. *Id.* Petitioner has no criminal convictions. *Id.* A 2012 arrest in Las Vegas arose from a domestic violence incident in which Petitioner herself contacted police after her former partner became violent, and the case was dismissed after she explained the circumstances to the court. *Id.*

Petitioner suffers from Systemic Lupus Erythematosus, a serious autoimmune condition affecting her blood that requires continuous medical treatment, including blood thinners and monthly specialist care. *Id.* On March 18, 2026, she received lupus medication while detained at Adelanto, underscoring the ongoing nature of her treatment needs. *Id.* Interruption of that treatment poses a risk of life-threatening clotting, and the TRO Application alleges that continuous specialist-level care and her prescribed medications are not reliably available in Ecuador. *Id.* Petitioner also fears return to Ecuador based on individualized and country-specific risks. *Id.* Her family members in Ecuador have recently been murdered, and she faces targeted threats upon return. *Id.* These risks are compounded by deteriorating country conditions, including a surge in violence and the existence of active joint military operations involving United States forces, with curfews and warnings of potential "collateral damage" issued in multiple provinces. *Id.*

CV-90 (12/02)                    **CIVIL MINUTES – GENERAL**                    Initials of Deputy Clerk <u>EVC</u>

On February 25, 2026, Petitioner was arrested and has since been detained at the Adelanto ICE Processing Center in Adelanto, California. *Id.* at 1. On March 4, 2026, counsel formally notified ICE Enforcement and Removal Operations that Petitioner expressed a fear of return and requested referral for a reasonable-fear interview. *Id.* at 4. Deportation Officer M. Russi responded the same day that Petitioner "does not currently qualify for a reasonable fear interview" because she has a final order of removal. *Id.* When counsel requested the legal basis for that position, Officer Russi reiterated that Petitioner was ineligible on that basis. *Id.* Counsel escalated the issue to OPLA leadership that same day, setting forth the legal basis for mandatory referral, but received no response. *Id.*

On March 9, 2026, Deportation Officer C. Jensen informed counsel that ICE did not intend to provide a reasonable-fear interview because of the removal order, but stated he would review the file and follow up. *Id.* In a written communication the same day, Officer Jensen confirmed that ICE's records reflected no Ninth Circuit filing and maintained that Petitioner was not eligible for a fear interview. *Id.* He further confirmed that USCIS had interacted with Petitioner on March 9, 2026, but that USCIS had no record of her or any referral in its system. *Id.* According to the Application, USCIS indicated that it believed Petitioner qualified for a fear screening. *Id.* Officer Jensen did not follow up after this communication. *Id.* at 5. Counsel sent an additional inquiry on March 17, 2026, and on March 18, 2026, Officer Russi responded by redirecting counsel to OPLA and indicating he was the assigned officer, but no substantive response was provided. *Id.* OPLA remained nonresponsive throughout this period. *Id.*

On March 18, 2026, Acting Assistant Field Office Director M. Jimeno spoke with counsel and subsequently confirmed in writing that ICE's position was not to refer Petitioner for a reasonable-fear interview or return her to proceedings, and that removal would continue. *Id.* In that same communication, he advised counsel to pursue any available appeals while removal was actively proceeding. *Id.* The Application characterizes this written confirmation as formalizing ICE's institutional position at the field-office level. *Id.* Later that same evening, Petitioner's commissary account was abruptly cut off, and counsel has been unable to reach her since, further indicating the imminence of removal. *Id. at 1.*

Petitioner seeks a TRO enjoining her removal from the United States pending adjudication of her claims, or, if she has already been removed, an order requiring her immediate return to the jurisdiction of this Court, as well as any other relief the Court deems just and proper.

## II.    LEGAL STANDARD

Fed. R. Civ. P. 65 (b) governs temporary restraining orders. A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda City.*, 415 U.S. 423, 439 (1974). The purpose of a preliminary injunction, in turn, is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

The standard for a TRO is similar to the standard for a preliminary injunction. *Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc.*, 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009). To obtain a TRO or a preliminary injunction, the plaintiff must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Alternatively, where there are merely "serious questions going to the merits," the moving party may still obtain a preliminary injunction where the balance of hardships "tips sharply" in the moving party's favor, and where the moving party also shows a likelihood of irreparable injury and that an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Also, a TRO is a kind of ex parte application, so the moving party must "establish why the accompanying proposed motion for the ultimate relief requested cannot be calendared in the usual manner. In other words . . . the moving party [must show why it] should be allowed to go to the head of the line in front of all other litigants and receive special treatment." *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F.Supp. 488, 492 (C.D. Cal. 1995) (explaining that the applicant for ex parte relief must demonstrate urgency and that it is without fault in creating the urgency).

## III.    DISCUSSION

For the reasons set forth below, each of the governing factors for temporary injunctive relief weighs decisively in favor of Petitioner. Petitioner has demonstrated a strong likelihood of success on the merits of her claims, a clear risk

of irreparable harm absent relief, and that the balance of equities and the public
interest favor maintaining the status quo pending adjudication of her claims.

## A. Likelihood of Success on the Merits

### i. *Violation of Mandatory Regulatory Obligation Claim*

Under 8 C.F.R. § 241.8(e), when a person subject to a reinstated removal
order expresses a fear of returning to the country designated in that order, the
regulation imposes a mandatory, nondiscretionary obligation. The regulation, in
part provides that, "the [noncitizen] shall be immediately referred to an asylum
officer for an interview to determine whether the [noncitizen] has a reasonable fear
of persecution or torture pursuant to § 208.31." 8 C.F.R. § 241.8(e). This
regulatory framework establishes clear, nondiscretionary obligations when a
person subject to reinstatement expresses fear. To be sure, § 241.8(e) uses the
mandatory term "shall be immediately referred," indicating no discretion exists to
decline the referral. *Id.* The Ninth Circuit has recognized this regulatory framework
stating that "§ 241.8(e) creates an exception by which [a noncitizen] who asserts 'a
fear of returning to the country designated' in his reinstated removal order is
'immediately' referred to an asylum officer who must determine if the [noncitizen]
has a reasonable fear of persecution or torture in accordance with 8 C.F.R. §
208.31." *See Ortiz-Alfaro v. Holder*, 694 F.3d 955, 956 (9th Cir. 2012). The
regulation further specifies that upon issuance of notice under § 241.8(b) that a
noncitizen is subject to removal, a noncitizen "described in paragraph (a) of this
section shall be referred to an asylum officer for a reasonable fear determination."
8 C.F.R. §  208.31(b). In the absence of exceptional circumstances, this
determination must be conducted within 10 days of the referral. *Id.*

Respondents have refused to refer Petitioner for a reasonable-fear interview
despite her express articulation of fear of return, in direct contravention of the
mandatory language of 8 C.F.R. § 241.8(e). That regulation requires that an
individual who expresses fear "shall be immediately referred" for a reasonable-fear
interview, leaving no discretion to decline referral. *Id.* Respondents' written and
repeated position that Petitioner "does not qualify" for such an interview reflects a
categorical refusal to follow this nondiscretionary requirement. *Id.* Because
Respondents have failed to provide the mandatory procedural safeguard triggered
by Petitioner's expressed fear, Petitioner is likely to succeed on the merits of her
claim that Respondents have violated binding federal regulations. *Id.*

Petitioner is likely to succeed on the merits of her claim that Respondents

violated mandatory regulatory obligations governing fear-based claims. Here, Respondents' refusal to provide a reasonable-fear interview despite Petitioner's expressed fear reflects a direct departure from this mandatory regulatory framework. By categorically denying referral, Respondents have effectively nullified the regulatory safeguard and proceeded as though the requirement does not exist. That conduct is inconsistent with the plain text of the regulation and controlling Ninth Circuit authority. *See Ortiz-Alfaro*, 694 F.3d at 956. Because the government lacks discretion to refuse referral once fear is expressed, and because it has done so here, Petitioner has demonstrated a clear likelihood of success on the merits of her regulatory claim.

### ii.   *Violation of Mandatory Statutory and Treaty-Based Obligations Claim*

INA § 241(b)(3)(A) provides that "the Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1231(a)(4)(A). Despite the use of the word "may," this provision establishes a mandatory prohibition, not a discretionary one. *See, e.g., Camposeco-Montejo v. Ashcroft*, 384 F.3d 814, 819 (9th Cir. 2004) ("Unlike asylum, withholding of removal is not discretionary.").The Ninth Circuit has consistently held that "withholding of removal is not discretionary" and that "the Attorney General is not permitted to deport [a noncitizen] to a country where his life or freedom would be threatened on account of one of the protected grounds." *Delgado v. Holder*, 648 F.3d 1095, 1101 (9th Cir. 2011) (citing *Al–Harbi v. INS*, 242 F.3d 882, 888 (9th Cir.2001)). The Supreme Court has similarly recognized that "the Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility" for withholding of removal. *See Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

The regulation at 8 CFR § 208.16(c)(1) implements withholding of removal under the Convention Against Torture ("CAT"), which operates alongside statutory withholding under section 241(b)(3). 8 C.F.R. § 208.16(c). Under this regulatory framework, an adjudicator must first determine whether the noncitizen is "more likely than not to be tortured in the country of removal." *Id.* If this standard is met, the noncitizen is entitled to protection, which "shall be granted" in the form of withholding of removal unless the noncitizen is subject to mandatory denial under specific exceptions. 8 C.F.R. § 208.16(d)(1). These exceptions include noncitizens who have been convicted of particularly serious crimes or who

pose a danger to the community. 8 C.F.R. §  208.16(d)(3).

Petitioner is also likely to succeed on the merits of her statutory and treaty-based claims because federal law prohibits removal to a country where an individual's life or freedom would be threatened or where they are more likely than not to be tortured. The statutory and regulatory scheme necessarily contemplates that individuals must be afforded a meaningful opportunity to present evidence supporting these claims before removal is executed. Without access to the required screening process, a noncitizen cannot establish eligibility for withholding of removal or CAT protection, and the government cannot fulfill its obligation to assess whether removal is legally permissible. The denial of that process, combined with the existence of substantial risk factors identified in the record, creates a substantial likelihood that Petitioner will ultimately be entitled to protection under these provisions.

Accordingly, by proceeding with removal while simultaneously refusing to provide the mechanisms required to adjudicate Petitioner's eligibility for statutory and treaty-based protection, Respondents have acted in a manner inconsistent with federal law. This failure supports a strong likelihood of success on the merits of Petitioner's claim that her removal would violate binding statutory and treaty-based obligations.

### iii.   Violation of Fifth Amendment Due Process Claim

The Supreme Court has held that "the Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693, (2001). This fundamental principle means that "it is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). Thus, the Supreme Court has held "the Due Process Clause protects a[ ] [noncitizen] subject to a final order of deportation[.]" *Zadvydas*, 533 U.S. at 693–694 (2001) (citing *Wong Wing v. United States*, 163 U.S. 228, 238, (1896).

"Immigration proceedings must provide the procedural due process protections guaranteed by the Fifth Amendment." *Vilchez v. Holder*, 682 F.3d 1195, 1199 (9th Cir. 2012) (citing *Lacsina Pangilinan v. Holder*, 568 F.3d 708, 709 (9th Cir. 2009)). "A 'noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of

deportation.' " *Nguyen v. Scott, et al.*, 796 F.Supp.3d 703, 727, (W.D. Wash. 2025) (quoting *Aden v. Nielsen*, 409 F.Supp.3d 998, 1009 (W.D. Wash. 2019) (citing *Mathews v. Eldridge*, 424 U.S. 319, 349, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). "[I]ndividuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence." *Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999)).

Here, the record demonstrates that Petitioner has been denied any meaningful opportunity to present her fear-based claims through the required screening process. Where an individual expresses a fear of return, the government is obligated to provide a mechanism—such as a reasonable-fear interview—through which those claims can be adjudicated before removal proceeds. *See Ortiz-Alfaro v. Holder*, 694 F.3d 955, 956 (9th Cir. 2012). The refusal to provide that process effectively forecloses Petitioner's ability to raise claims for withholding of removal or protection under the CAT, thereby depriving her of a meaningful hearing at a critical stage of the proceedings.

This deficiency is especially significant where, as here, removal appears imminent and irreversible. The Ninth Circuit has recognized that due process is violated where the government executes removal without affording an individual a fair opportunity to present claims related to the designated country of removal. See *Najjar v. Lynch*, 630 F. App'x 724, 724 (9th Cir. 2016) ("In the context of country of removal designations, last minute orders of removal to a country may violate due process if an immigrant was not provided an opportunity to address his fear of persecution in that country."). Courts within this Circuit have similarly held that last-minute or accelerated removal, without adequate notice or an opportunity to be heard, raises serious constitutional concerns. *See, e.g.*, *Gomez v. Mattos*, No. 2:25-CV-00975-GMN-BNW, 2025 WL 3101994, at *6 (D. Nev. Nov. 6, 2025); *Nguyen v. Scott*, 796 F.Supp.3d 703, 728–29 (W.D. Wash. 2025); *Baltodano v. Bondi*, No. C25-1958-RSL, 2025 WL 2987766, at *3 (W.D. Wash. Oct. 23, 2025).

Under the familiar balancing framework, the deprivation of Petitioner's interest in remaining in the United States while pursuing available forms of relief—combined with the government's failure to provide required procedural safeguards—demonstrates a clear likelihood of success on the merits. The absence of notice, the denial of a meaningful opportunity to be heard, and the imminent risk of irreversible removal together establish a substantial constitutional violation. Accordingly, this factor weighs decisively in Petitioner's favor.

## B. Likelihood of Irreparable Injury

It is clear and self-evident that removal to a country where torture is a possibility constitutes serious and irreparable harm. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 391 (D. Mass. 2025) ("Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable."), *stayed pending appeal*, 145 S. Ct. 2153 (2025). Moreover, it is well established that the deprivation of constitutional rights "'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Where, as here, the alleged deprivation of a constitutional right is involved, courts recognize that no further showing of irreparable injury is necessary. *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005).

Petitioner faces imminent and irreparable harm absent injunctive relief, including removal to a country where she alleges a risk of persecution, torture, and inability to access necessary medical care. The interruption of her critical medical treatment for lupus alone creates a substantial risk of serious bodily harm, and removal would foreclose her ability to pursue her claims for relief in the United States. Accordingly, this factor weighs strongly in favor of granting relief.

## C. Balance of Equities and Public Interest

The balance of equities and the public interest tip in Petitioner's favor. Petitioner faces the risk of removal to a third country where she may be subject to persecution and torture. Respondents would suffer only administrative inconvenience if supervision were to continue temporarily. Courts have recognized that there is a strong public interest in preventing removal to countries where individuals may face serious harm. *See Villanueva-Bustillos v. Marin*, 370 F. Supp. 3d 1083, 1090 (C.D. Cal. 2018) ("there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm" (citing *Nken v. Holder*, 556 U.S. 418, 436 (2009))). To be sure, the public has an interest in the execution of immigration laws, but that interest does not outweigh "an interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436; *see also Ovsepian*, No. 5:25-cv-01937-MEMF-DFM, at *14–15 ("Although there is a countervailing 'public interest in prompt execution of removal orders,' it is well established that 'our system does not permit agencies to act unlawfully even in pursuit of desirable ends[.]'").

The balance of equities and the public interest favor Petitioner. While Respondents have an interest in enforcing immigration laws, that interest does not extend to actions taken in violation of mandatory regulations and constitutional protections. Petitioner, by contrast, faces the risk of irreparable harm, including potential persecution, loss of access to medical care, and deprivation of due process rights. The public interest is served by ensuring that the government complies with its own laws and affords individuals the procedural protections to which they are entitled before effecting removal. Accordingly, these factors weigh in Petitioner's favor.

### D. Court's Discretion in Waiving Bond

Rule 65(c) provides that a court may require a party seeking injunctive relief to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Despite this mandatory phrasing, "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (emphasis in original). A court may dispense with a bond altogether "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (quoting *Jorgensen*, 320 F.3d at 919). Courts have also waived security where requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

Here, the Court cannot identify any monetary harm Respondents would suffer as a result of the injunction, and none is apparent from the record. *See* TRO Opp'n. The relief ordered merely requires Respondents to comply with existing statutory and constitutional procedures before removing Petitioner. Whereas here, Petitioner has demonstrated a likelihood of success on the merits and the injunction safeguards fundamental due process rights, requiring a bond would serve no protective purpose and would risk burdening access to constitutionally grounded relief. *See Couturier*, 572 F.3d at 1086; *Baca*, 936 F. Supp. at 738. Accordingly, the Court **WAIVES** the bond requirement

### IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Petitioner's Application

CV-90 (12/02)                    **CIVIL MINUTES – GENERAL**                    Initials of Deputy Clerk <u>EVC</u>

for a Temporary Restraining Order and **ORDERS**:

1.  Respondents are hereby ENJOINED from removing Petitioner Diana Garrido, A# 075702-521, from the United States pending further order of this Court.

2.  Respondents are further ENJOINED from transporting Petitioner to any flightline or point of departure for removal from the United States.

3.  Respondents are ENJOINED from moving Petitioner out of the State of California and must return her if she has been moved.

4.  Respondents are ORDERED to MAINTAIN Petitioner within the jurisdiction of this Court.

5.  If Petitioner has already been removed, Respondents are ORDERED to take all steps necessary to RETURN her to the Central District of California forthwith.

6.  Within twenty-four (24) hours of service of this Order, Respondents are ORDERED to file a declaration disclosing Petitioner's current location, the identity of her immediate custodian, and any transfer or transportation that has occurred since March 18, 2026.

7.  Respondents are further ORDERED to immediately refer Petitioner for a reasonable-fear interview pursuant to 8 C.F.R. §§ 241.8(e) and 208.31, with counsel participation and the opportunity to submit evidence, and shall take no action to execute removal pending completion of that process.

8.  Respondents are further ORDERED to show cause, in person, why a preliminary injunction should not issue on Friday, April 3, 2026, at 10:00 a.m.

**IT IS SO ORDERED**.